**Lloyd WESCOTT, Plaintiff-Appellee,**

v.

**IMPRESAS ARMADORAS, S.A. PANAMA, Defendant-Appellant,**

v.

**BRADY HAMILTON STEVEDORE CO., Intervenor-Appellee.**

**No. 76–1611.**

United States Court of Appeals, Ninth Circuit.

Nov. 14, 1977.

---

John R. Brooke (argued), of Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for defendant-appellant.

Raymond J. Conboy (argued), Portland, Or., for plaintiff-appellee.

Before BARNES, and ELY, Circuit Judges, and VAN PELT,[*] District Judge.

BARNES, Senior Circuit Judge:

## FACTS

Wescott[1] was a longshoreman with 18 years experience hired by the Brady Hamilton Stevedore Co. ("Brady"), an independent contracting stevedore, to work aboard the Merchant Vessel 'Ioanna" which was owned and operated by Impresas Armadoras, S.A. Panama ("Impresas"). At the times herein considered, Brady had a superintendent in charge of the overall stevedore work on the vessel, a "walking boss" overseeing the operations in the hatches wherein the loading was performed, and a "gang boss" who directed the workers at each hatch.

The operation involved herein was the loading of two types of wheat onto the vessel Ioanna. On the morning of the accident, stevedore superintendent Wilhemson suggested using a sloping type separation wherein the first type of wheat is poured into the hatch, runs off to its natural angle of repose and a burlap material is placed on top over the stowed grain before the second type of grain is poured in. The ship's master, however, requested that a flat type separation be used which necessitated a levelling off of the first wheat before the burlap material is employed and the second type of wheat is poured on top. The ship's master did not instruct Brady's agents on how to accomplish the flat type separation as the process of loading was supposedly within the area of the Brady's expertise.

Brady chose to utilize a "panning" method to fill out the grain in the hatch. This involved the use of a curbed metal pan about 18 inches wide and about 8 or 9 feet in length (weighing approximately 200 pounds) which is attached to the grain spout and is movable so that the flow of the wheat off the pan can be directed. Rope taglines are used by longshoremen inside the hatch to control the pan.

Wescott and another longshoreman, Mock, were assigned by Brady to work inside the hatch during the panning process. Both were experienced and had made level separations before, although not through a panning process. After the pan was lowered into the hatch, Wescott and Mock could not find an appropriate fixture to secure the rope taglines. Although there were padeyes and other fixtures in the hatch, neither longshoremen could reach them.[2] Wescott and Mock informed their supervisors on deck of the trouble and after some discussion it was decided to proceed with Wescott and Mock holding the pan and two additional taglines tied to the lip of the pan.

Initially, a half-stream rate was used. Before too long, however, the force of the wheat through the spout onto the pan caused it to whip and swing about. Wescott had the pouring stopped. He did not inform the deck men of the movement of the pan or ask them to reduce the volume of wheat. After having the spout moved aft a bit, Wescott held the pan and Mock held onto the taglines, and Wescott ordered the pouring to begin again. Within two or three minutes the pan and spout started whipping even more violently this time and Wescott was injured while holding onto the pan until Mock could get clear of it.

At no time prior to the accident were the ship's personnel informed by Brady of the trouble in loading or advised that a flat type of separation would present any danger to the longshoremen.

---

[*] Honorable Robert Van Pelt, Senior District Judge for the District of Nebraska, sitting by designation.

[1] Appellee's Brief, page 3, points out that plaintiff-appellee Wescott's name is misspelled in the pleadings as "Westcott."

[2] There was some testimony to the effect that the taglines have to be secured at a certain lateral angle in order to be useful. The presence of the fixtures above the necessary level was therefore not helpful to the panning process.

On June 25, 1974, Wescott filed an action for personal injuries against the defendant-Impresas which was subject to the 1972 Amendment to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. ("1972 Amendments").[3] Wescott had previously received a workman's compensation award from Brady.

Impresas answered denying its liability and charging the plaintiff with contributory negligence. In a proposed draft of a pretrial order, Impresas, for the first time, raised the issue of the stevedore's negligence[4] and thus invoked, indirectly, the application of the Murray Credit (or more aptly an Equitable Credit) doctrine.[5] Brady

---

3. *See* for an excellent discussion of the 1972 *Amendments and the problems raised therein:* Steinberg, The 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act: Negligence Actions by Longshoremen against Shipowners—a Proposed Solution, 37 Ohio St.L.J. 767 (1976) ("Steinberg").

4. Consistent with the 1972 Amendments, an injured longshoreman's only remedy against his employer, the stevedore company, is workmen's compensation. He can, however, sue the shipowner for common law damages, not based on the preamendment grounds of a warranty of seaworthiness, but on a theory of negligence. After the 1972 Amendments, a defendant shipowner cannot obtain either contribution or indemnity from a concurrently negligent stevedore company. Thus, the situation may arise where the shipowner must pay the whole judgment even though the employer may have also been partially responsible for the injuries. Yet, the employer remains able to obtain a lien on the employee's judgment which provides for a reimbursement to the stevedore company to recover the workmen's compensation payments. The Murray Credit and Equitable Credit doctrines were developed to mitigate that unreasonable result. Steinberg, *supra*, 37 Ohio St.L.J. at 774–783.

5. As discussed in Steinberg, *supra*, 37 Ohio St. L.J. 782–783, the "Murray Credit" doctrine has only been adopted by the District of Columbia Circuit. It provides for a one-half reduction in the common law damages awarded to the injured plaintiff against one joint tortfeasor where the other tortfeasor has paid some statutorily required *workmen's compensation and is*, thereafter, by law immune from both further claims of the injured party and an obligation to contribute to any eventual award issued against the other joint tortfeasor.

However, from the briefs and pleadings in this case, it is clear that the doctrine which Impresas was really invoking was the similar, but different and separate Equitable Credit doctrine suggested by Cohen and Dougherty in their article, "The 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act: An Opportunity for Equitable Uniformity in Tripartite Industrial Accident Litigation," 19 N.Y.L.F. 587 (1974) ("Cohen and Dougherty") and adopted by various courts including the Fourth Circuit, *Edmonds v. Com-*

*pagnie Generale Transatlantique,* 558 F.2d 186, 192 (4th Cir. 1976). This circuit and the Second Circuit have specifically rejected the doctrines. *Dodge v. Mitsui Shintaku Ginko K.K. Tokyo,* 528 F.2d 669, 671–672 (9th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *Shellman v. United States Lines, Inc.,* 528 F.2d 675, 680 (9th Cir. 1975), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1668, 48 L.Ed.2d 177 (1976); *Landon v. Lief Hoegh & Co.,* 521 F.2d 756, 763 (2d Cir. 1975), *cert. denied, A/S Arcadia v. Gulf Insurance Co.,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976).

The Equitable Credit doctrine provides that:

■ An employee injured in the course of his employment recovers workmen's compensation benefits from his employer, regardless of fault. If the injury was not contributed to by the negligence of any third party, he recovers nothing more than these compensation benefits.

■ If the injury was caused by the fault of a third party, the employee may sue such third party for common law damages. His recovery is to be reduced to the extent of his own contributory negligence. And, if the employer was not also at fault, the full amount of all compensation benefits is to be deducted from the employee's recovery and paid to the employer in reimbursement.

■ If the employer was a joint tortfeasor, it could be impleaded or otherwise bound by the third party. However, in such a case, the actual dollar liability of the employer should not exceed the amount of the employer's dollar liability in compensation. Just as every employee will be guaranteed minimum benefits of workmen's compensation, so will every employer be guaranteed a maximum liability of compensation benefits, whether directly or indirectly, for any employee's industrial accident.

The proportional amount of any employer's fault is to go in mitigation of the third party's damages, in the same fashion as the employee's contributory negligence, so that the third party actually responds to the employee only for that amount of the employee's damages as is equal to the third party's proportion of the fault.

■ From any recovery the employee obtains from the third party, the employee is to reimburse the employer for the compensation benefits paid. However, if any employer

moved and was granted permissive intervention under Rule 24(b) of the Federal Rules of Civil Procedure ("FRCP") in order to counter the defendant's charges that its negligence caused, in whole or in part, the plaintiff's injuries. Brady's answer to the defendant's initial answer contained a counterclaim against the Impresas to recover any monies paid to the plaintiff for workmen's compensation.

The trial on the issue of liability was segregated from the trial on the damages issue. The pretrial order adopted by the trial court and signed by the attorneys for the defendant and plaintiff, but not by the intervenor's attorney, did not raise the issue of Brady's negligence, the Murray Credit question or Brady's counterclaim against Impresas.

On September 10, 1975, at the close of trial, the court denied the defendant's motion for a directed verdict. The jury decided in the plaintiff's favor and in response to special interrogatories stated that it found Wescott not to have been negligent, Impresas to have been 60% negligent, and Brady to have been 40% negligent. The defendant moved, but was denied, a motion for judgment notwithstanding the jury verdict. Later, on the issue of damages, the jury awarded Wescott approximately $88,500. The judgment issued on December 3, 1975, by the trial court, omitting recitals, stated:

> "It is Ordered and Adjudged that plaintiff Lloyd Wescott have and recover of defendant Impresas Armadoras, S.A. Panama the sum of $88,468.00."

The judgment did not mention the Murray Credit question or Brady's counterclaim.

On November 21, 1975, this court rejected the Murray Credit and Equitable Credit doctrines in its decisions in *Dodge, supra*, 528 F.2d at 671 [6] and *Shellman, supra*, 528 F.2d at 680. In its "Designation of Record of Points to be Raised on Appeal," the defendant listed the failure of the trial court to apply the Equitable Credit doctrine. However, in its brief before this court, Impresas only argued as to whether the failure to grant the directed verdict or the motion for judgment notwithstanding the jury verdict was error.

Prior to oral argument herein, this court noted that a question of jurisdiction might have arisen due to the failure of the district court's judgment to pass upon the rights of Intervenor Brady. The parties were ordered to file supplemental briefs on the question, and did so.

## ISSUES

1. Is the district court's judgment below final in terms of Rule 54(b) of the FRCP such that this court has jurisdiction to hear the appeal?

2. Did the trial court err in refusing to grant the defendant's motions for a directed verdict or judgment notwithstanding the jury verdict?

## DISCUSSION

### I. *Jurisdiction.*

█ Although the documents and pleadings in the record before this court are rather sketchy and confused, it appears that the defendant-Impresas did raise the issue

---

negligence resulted in a diminution or reduction of the employee's recovery against the third party, the employee may deduct and retain that amount from the compensation benefits to be reimbursed.

Thus, if the damages attributable to the employer's fault were less than the amount of the compensation benefits, the employer would recover only the difference between the amount of the compensation benefits and the amount by which its fault reduced the employee's recovery. If the employer's fault were in excess of the compensation benefits, it would not receive any reimbursement, but neither would it be liable for any excess. In such situation the loss to the employee is the consideration for the absolute right to compensation benefits regardless of fault.
Cohen and Dougherty, supra, 19 N.Y.L.F. 606–607.

The parties herein continually refer to the Murray Credit rather than the Equitable Credit doctrine.

6. The defendant's and plaintiff's attorneys in this case are the same ones who represented the appellant-defendant and appellee-plaintiff, respectively in the *Dodge* appeal before this court.

of the application of the Murray (Equitable) Credit doctrine. Likewise, Brady did submit a counterclaim against Impresas. Thus, the failure of the trial court to deal with the rights of the intervenor Brady or to make an express determination of a final judgment prevents the trial court's judgment from being a final appealable decision pursuant to Rule 54(b) of the FRCP and 28 U.S.C. § 1291.

Two arguments are raised asserting that this court has jurisdiction despite the failure to meet Rule 54(b). First, it is argued that Impresas abandoned the Murray (Equitable) Credit claim and hence the trial court did not have to rule on it. *Cf. General Time Corp. v. Padua Alarm System*, 199 F.2d 351 (2d Cir. 1952), *cert. denied*, 345 U.S. 917, 73 S.Ct. 728, 97 L.Ed. 1351 (1953); *Sierra Club v. Morton*, 400 F.Supp. 610, 620 (N.D.Cal.1975). That contention is unpersuasive for two reasons. Initially it is noted that the defendant-appellant, in its supplemental brief on jurisdiction, asserts to this court that it never abandoned the Murray (Equitable) Credit claim. Examining the record, it appears that Impresas did not strongly press the issue (e. g., the trial court's pretrial order does not list the Murray (Equitable) Credit question as a matter in contention; Impresas' Opening Brief to this court fails to mention the issue). However, there is no evidence to indicate any actual abandonment of the Murray (Equitable) Credit claim. Moreover, even if Impresas had abandoned the claim, Brady's counterclaim was still present and thus the trial court was still obligated to resolve the question of Intervenor Brady's rights.

A second argument is made that this court should take jurisdiction under the exception to the final judgment rule stated in *Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 152–154, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964). In *Gillespie*, the administratrix of the estate of her son, Daniel, brought actions against respondent vessel owner-employer to recover damages for Daniel's death for herself and for Daniel's brother and sisters under the Jones Act and the Ohio Wrongful Death Statute. The respondent moved to dismiss all reference to the laws of Ohio and claims of Daniel's brother and sisters. The trial court agreed. Gillespie appealed for herself, joined by the brother and sisters. The respondent moved to dismiss the appeal on the ground that the rulings appealed from were not "final" decisions as required by 28 U.S.C. § 1291. The Court of Appeals determined the controversy on the merits without deciding the question of appealability and affirmed the trial court. The Supreme Court reversed on the merits but voiced approval of the Court of Appeals' handling of the case. The Supreme Court stated that:

"In this Court respondent joins petitioner in urging us to hold that 28 USC § 1291 (1958 ed.), does not require us to dismiss this case and that we can and should decide the validity of the District Court's order to strike. We agree. Under § 1291 an appeal may be taken from any 'final' order of a district court. But as this Court often has pointed out, a decision 'final' within the meaning of § 1291 does not necessarily mean the last order possible to be made in a case. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 545, 69 S.Ct. 1221, 1223, 93 L.Ed. 1528. And our cases long have recognized that whether a ruling is 'final' within the meaning of § 1291 is frequently so close a question that decision of that issue either way can be supported with equally forceful arguments, and that it is impossible to devise a formula to resolve all marginal cases coming within what might well be called the 'twilight zone' of finality. Because of this difficulty this Court has held that the requirement of finality is to be given a 'practical rather than a technical construction.' *Cohen v. Beneficial Industrial Loan Corp., supra*, 337 U.S., at 546, 69 S.Ct. 1226. *See also Brown Shoe Co. v. United States*, 370 U.S. 294, 306, 82 S.Ct. 1502, 8 L.Ed.2d 510; *Bronson v. Railroad Co.*, 2 Black 524, 531, 17 L.Ed. 347; *Forgay v. Conrad*, 6 How. 201, 203, 12 L.Ed. 404. *Dickinson v. Petroleum Conversion Corp.*, 338 U.S. 507, 511, 70 S.Ct. 322, 94 L.Ed. 299, pointed out that in deciding the question of finali-

ty the most important competing considerations are 'the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other.' Such competing considerations are shown by the record in the case before us. It is true that the review of this case by the Court of Appeals could be called 'piecemeal'; but it does not appear that the inconvenience and cost of trying this case will be greater because the Court of Appeals decided the issues raised instead of compelling the parties to go to trial with them unanswered. We cannot say that the Court of Appeals chose wrongly under the circumstances. And its seems clear now that the case is before us that the eventual costs, as all the parties recognize, will certainly be less if we now pass on the questions presented here rather than send the case back with those issues undecided. Moreover, delay of perhaps a number of years in having the brother's and sisters' rights determined might work a great injustice on them. . . ." 379 U.S., at 152 and 153, 85 S.Ct. at 311.

On the one hand, balancing the inconvenience and costs of piecemeal review with the danger of denying justice by delay on the other, a strong argument can be made for placing the present case within the *Gillespie* exception. First of all it is noted that the unresolved issue (Intervenor Brady's rights under the trial court's decision) is entirely separate from the merits of the liability issue which is now on appeal to this court. Likewise, there has already been a trial on the merits and a jury determination of the factual issues. The issue of Brady's rights involves purely a question of law and has clearly been addressed by this circuit in recent cases. *See* footnote 5, *supra*. Despite the fact that one circuit court has adopted the Equitable Credit doctrine, *Edmonds, supra*, 558 F.2d at 192 (4th Cir.), the trial court below is bound by this court's rejection of that and the Murray Credit doctrines. *Dodge, supra*, 528 F.2d at 671–672; and *Shellman, supra*, 528 F.2d at 680.

Thus, under the current law, the trial court must decide against the application of the credit doctrines and in favor of Brady's counterclaim. Given the above factors "it does not appear that the inconvenience and cost of trying this case will be greater because the Court of Appeals decided the issues raised instead of compelling the parties to go to . . . [the trial court to decide the already settled issue of law]." (Paraphrasing *Gillespie, supra*, 379 U.S. at 153, 85 S.Ct. at 311).

It is also noted herein that requiring the parties to go back to the trial court on the issue of Intervenor Brady's rights would be entirely pointless in terms of costs and inconvenience if this court eventually finds that the trial court erred below in refusing to grant the defendant's motion for a directed verdict or judgment notwithstanding the jury verdict. If this court takes the above course, Brady's rights no longer remain an issue as they are dependent upon the judgment in favor of Wescott.[7] A decision that Impresas was not liable to Wescott for tort damages would mean that Brady would have no claim against Impresas as the latter would not be held responsible for Wescott's injuries and there would be no award against which Brady would assert the application of the Murray (Equitable) Credit doctrine.

We grant that the jurisdictional question raised herein appears to be a close one. See *United California Bank v. Fadel*, 482 F.2d 274, 276 (9th Cir. 1973); *Island Service Co. v. Perez*, 255 F.2d 559, 560–561 (9th Cir. 1957).

Nonetheless, after balancing the competing considerations, we are persuaded that the facts of this case fall within the range of situations contemplated by *Gillespie*. Consequently, we conclude that the judgment of the District Court was, as a matter of practical rather than technical construction, a final judgment within the meaning of § 1291 and that, accordingly, we may properly entertain jurisdiction of the appeal.

---

7. Brady's rights are similar to a lien upon Wescott's award of damages from Impresas in the amount of workmen's compensation payments it has made to Wescott.

II. *Liability Issue.*

 It is well settled that federal law governs lawsuits between an injured longshoreman and a shipowner. *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 409–410, 74 S.Ct. 202, 98 L.Ed. 143 (1953). For all practical purposes, a motion for directed verdict and a subsequent motion for judgment notwithstanding the verdict are measured by the same standard. *Hallmark Industry v. Reynolds Metals Co.,* 489 F.2d 8, 13 (9th Cir. 1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974); *Juhnke v. EIG Corp.,* 444 F.2d 1323, 1325 (9th Cir. 1971); 9 Wright and Miller, Federal Practice and Procedure: Civil § 2537, at 599 (1971). Under that standard, the evidence and all reasonable inferences must be viewed in a light most favorable to the party against whom the motion is made. *Cullinan v. Burlington Northern, Inc.,* 522 F.2d 1034, 1036 (9th Cir. 1975).

 Under the 1972 Amendments, the shipowner is no longer vicariously liable for the negligence of the stevedore company. *Gay v. Ocean Transport & Trading Ltd.,* 546 F.2d 1233, 1239 n.10 (5th Cir. 1977); *Teofilovich v. d'Amico Mediterranean/Pacific Line,* 415 F.Supp. 732, 734–735 (C.D.Cal. 1976). Therefore, in this case, any negligent acts of the shipowner must initially be noted and considered.

From the record, the only affirmative act done by the shipowner and its agents was to request that the two types of wheat be stored using a flat type separation rather than a sloping type separation. The plaintiff argues that, pursuant to the above request, the jury was entitled to infer that the shipowner did or should have known that: (1) the panning method utilized by the stevedore company was the *only* practical method of accomplishing the flat type separation; (2) the panning method was more dangerous than other methods used to load grain; (3) the vessel was not equipped to have such method employed in its hatches at that time as the padeyes and fixtures, which are necessary for the utilization of

the panning process, were located too high in the hatch; and (4) the employees of the stevedore company would not notice said problem with the use of the panning method before the occurrence of an accident, or even if they did notice the problem, would proceed anyway.

After carefully reviewing the record, it is clear that there is no evidence that the shipowner or its agents did, or should have known, that by requesting a flat type of separation a panning method would be utilized. Nor is there any evidence to indicate that they would know that such method would be more dangerous than that normally employed by the stevedore company in loading grain. It is clear that Brady's agents chose the panning method as they thought it was the most practical way of performing the task. While there is some evidence to indicate that panning was the most practical method there is no evidence which would support the conclusion that it was the *only* method. Indeed, there is testimony of the use of men with "scrappers" (query "scrapers"?) to level the grain which, while perhaps impractical because of time considerations, was an alternate process.

 We think it important to emphasize that the means of loading the grain was within Brady's area of expertise as an independent contracting stevedore. Brady chose the panning method without informing Impresas or its agents that it was going to utilize that process.[8] Nor did Brady advise Impresas that the panning method would require certain fixtures in the hatch or that it was a potentially dangerous form of loading. It is evident that Impresas and its agents, after the initial request for a certain type of separation, were not advised by Brady: (1) of the method which Brady would use, (2) of the dangers involved, and (3) that perhaps a different method should be used, (4) of the necessary fixtures which would be required, or (5) of the problems Brady experienced once it attempted to use the panning method. Given the failure of

---

8. While admittedly Impresas could have ordered Brady to use a particular method, it did not. Brady was therefore free to utilize its expertise in choosing the optimum method.

Brady to communicate any of the above information to Impresas and the lack of any evidence to indicate that Impresas or its agents would have inherent knowledge of the above elements, the mere request for a specific type of separation by agents of the shipowner was not an act which can be considered as negligent, nor which can be held to have been the proximate cause of plaintiff's subsequent injury.

Even assuming that knowledge of the use of a panning method can be imputed to the shipowner, it seems clear to us that the ultimate cause of the plaintiff's injuries was the decision by Brady's agents to proceed with the panning, in spite of their knowledge that the ship did not have the necessary fixtures at that time. There was evidence to the effect that the ship's hatch did have padeyes and fixtures which could have been utilized in panning but that they were not at the proper levels. Thus, even if the shipowner knew of the use of the panning method, for Impresas to be held legally liable, it would also have to have knowledge of the necessity of proper fixtures in the hatch *and* that the fixtures, which were in the hatch, were not at the proper levels. There is no evidence in the record of Impresas' knowledge of the latter two facts.

Again even assuming that Impresas knew all of the above, it is clear that the lack of proper fixtures in the hatch was an obvious dangerous condition in the use of the panning method of which Brady's agents were soon aware. The longshoremen in the hatch quickly realized the problem before the panning operation began, and they informed their supervisors of the lack of proper fixtures. That information was not relayed to the ship's personnel. Nor was any attempt made by Brady to change its method of operation, or to request from Impresas a change in the type of separation or to aid to rectify the dangerous condition. It is apparent that Brady's agents were in the position to solve the problem, whereas Impresas' employees were far less capable to correct the situation. Clearly, Brady, of its own volition, chose to go ahead despite the condition in the hatch. Likewise, it was evident to Brady's employees in the hatch that the lack of proper fixtures would cause the machinery to move dangerously. After initially using the pan, it whipped about and Wescott had the pouring stopped. He did not inform the superintendent of the movement of the pan. (Impresas and its agents were not aware of the problem.) Nor did he ask that the operations cease or even that the rate of pouring be reduced so as to decrease the whipping action. After he signalled the loading to begin again, Wescott was injured.

Thus, even had Impresas known of an alleged lack of proper fixtures, Brady's employees were aware of the existing condition, and chose to proceed even though they knew that the pan in the hatch creating the danger could not be controlled. Given the evidence in the record and all reasonable inferences which can be drawn from the evidence, there is no basis for placing any liability upon the shipowner herein. *Cf. Brown v. Mitsubishi Shintaku Ginko,* 550 F.2d 331, 332–334 (5th Cir. 1977); *Anuszewski v. Dynamic Mariners Corp., Panama,* 540 F.2d 757, 758–759 (4th Cir. 1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); "[T]he vessel owner owes no duty to protect or to warn the stevedoring company or its employees against dangerous conditions in their equipment arising in the course [of] performing their contractual duties on board the ship." *Hurst v. Triad Shipping Co.,* 554 F.2d 1237, 1251–1252 (3rd Cir. 1977). The Second Circuit has recently spoken on the subject in no uncertain terms. *Munoz v. Flota Merchante Grancolombiana,* 553 F.2d 837 (C.A.2d, decided 4/25/77). The trial court below erred in not granting the defendant's motions for directed verdict and judgment notwithstanding the verdict.

The judgment below is reversed; and the case is remanded to the district court with instructions to enter a judgment notwithstanding the verdict in favor of the defendant shipowner. No other issues will then remain.