William MURPHY, Plaintiff,

v.

NATIONAL SHIPPING CORPORATION OF PAKISTAN, a corporation, et al., Defendants.

The HARTFORD INSURANCE GROUP, a corporation, Plaintiff in Intervention,

v.

William MURPHY, National Shipping Corporation of Pakistan, a corporation, and Does I through L, inclusive, Defendants in Intervention.

No. CV 75–1216–RJK.

United States District Court,
C. D. California.

July 20, 1978.

John A. Marin, Wilmington, Cal., for plaintiff William Murphy.

Leon A. Pinney, Sherman Oaks, Cal., for plaintiff in intervention The Hartford Ins. Group.

Lillick, McHose & Charles, Ralph D. Kirwan, Los Angeles, Cal., for defendant National Shipping Corp. of Pakistan.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, District Judge.

This is an action for personal injuries sustained by plaintiff William Murphy on December 4, 1973 on board defendant's vessel, the M/V RAVI, which was upon the navigable waterways of the United States. Plaintiff filed this action in state court, alleging defendant was negligent under the provisions of the Longshoremen's and Harbor Worker's Compensation Act (Amended), 33 U.S.C. § 901 *et seq.* (hereinafter "Act"). Defendant thereafter removed the action to this court based upon diversity of citizenship. 28 U.S.C. §§ 1332 and 1441. The matter proceeded to trial by jury. At the close of plaintiff's case, defendant moved for directed verdict pursuant to Rule 50 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court granted defendant's motion and ordered judgment in favor of defendant and against plaintiff.

■ In considering defendant's motion for directed verdict, the Court must view the evidence in a manner most favorable to plaintiff. *See, e. g., Phipps v. N.V. Nederlandsche Amerikaansche Stoomvart, Maats,*

259 F.2d 143 (9th Cir. 1958). The evidence, so viewed, established that on December 3, 1973 defendant's vessel, the M/V RAVI (hereinafter "vessel") called at Wilmington, California to discharge general cargo and retained Marine Terminals Corporation (hereinafter "MTC"), an expert independent stevedoring contractor, to do so. Plaintiff was a longshoreman in the employ of MTC, which supervised all stevedoring operations on board the vessel.

Plaintiff and other MTC longshoremen boarded the vessel at approximately 8:00 a. m. on December 3, 1973. They were assigned to the upper tween deck of the No. 2 hatch. The longshoremen were supervised exclusively by MTC foremen. When work commenced, plaintiff observed general cargo stowed in the square of the hatch. He and his fellow longshoremen discharged this cargo and then lowered a forklift into the hatch.

At that point the men noticed fifty pound sacks of zinc chromate stowed approximately four feet high in the port and starboard wings. On top of the sacks in both wings were crates of tile resting on pallet boards. The sacks had been loaded by stevedores in Nagoya, Japan. The palletized crates of tile had been loaded by stevedores in Yokohama, Japan. There was no evidence that the vessel officers or crew directed the Japanese stevedores to stow the palletized crates of tile atop the sacks or exercised any control over the manner in which crates were stowed, except to specify the approximate location of the cargo in the hatch in order to facilitate discharge at the vessel's ports of destination and to maintain proper balance and trim of the vessel while she was at sea. After the cargo was loaded, water-tight hatch covers were placed on the hatches and not removed until the vessel arrived at Wilmington, California. It is not disputed that the last persons to handle the cargo were Japanese longshoremen in Yokohama, and the next persons to handle the cargo were MTC longshoremen at Wilmington.

Plaintiff and his fellow longshoremen began work on the starboard side of Hatch No. 2. First, they used the forklift to move the palletized crates of tile from atop the sacks. The forklift driver inserted the blades of the forklift into the opening in the pallet boards, lifted the palletized cargo and removed it to the square of the hatch. Other longshoremen then attached bridles to the pallet boards and used the ship's cargo winches to lift the cargo out of the hold and lower it onto the dock. After the men began discharging the crates of tile, they discovered the sacks were leaking a white, slippery powder. The leaking powder created a slippery condition on the starboard side decks of the hatch. The stevedore hatch foreman in Hatch No. 2 provided the longshoremen brooms, shovels and trash bins to enable them to clean up the leaked powder. Work proceeded without incident throughout the day shift of December 3, 1973.

On December 4, 1974, plaintiff and his fellow longshoremen returned to Hatch No. 2. Under the direction of the stevedore hatch foreman, they shifted to the port side of the hatch where they encountered essentially the same stow, in which the sacks of zinc chromate were stowed approximately four feet high in the wings. On top of the sacks were palletized crates of tile. Plaintiff testified he did not observe leakage on or about the decks before he and the other longshoremen began to discharge the crates of tile, again using a forklift in the same manner they had employed on the starboard side. After the forklift driver removed the palletized cargo from atop the sacks, plaintiff noticed powder had leaked from the sacks onto the deck. Upon closer examination, he noticed some of the sacks on the top and front of the stow were ripped. This created a slippery and hazardous footing condition on the deck. Plaintiff and the other longshoremen requested and received brooms and shovels to use to clean up the powder. Plaintiff and his work partner then took two empty pallets, placed them on the deck in front of the stow of sacks, and began hand loading pallets boards with sacks. From time to time, the forklift driver came by, picked up one of the pallet boards and moved it to the square of the hatch, where other longshoremen discharged it with the vessel's cargo gear.

Plaintiff admitted he could have swept the area after each load was removed. However, he testified that had they done so, they would still be there. One of the longshoremen stood idly by, taking a permissible work break, in the port wing of the hatch while plaintiff and his work partner loaded the sacks. Plaintiff admitted the man could have been sweeping during this time, but did not. It was also undisputed that the ship paid the stevedore company and its longshoremen to perform cleanup chores. In the event the work took more time, the ship was required to continue to pay the stevedore company to keep the area clean. Plaintiff testified that from time to time he swept the area. Nevertheless, the deck around the stow remained covered with the slippery powder.

It was undisputed that there were no officers or crewmen in the hatch at any time. Moreover, the vessel officers and crewmen were not allowed to do any cleanup work at all in the hatches while the longshoremen were working. Such work was described as "longshoremen's work," not only by custom and practice, but also by virtue of the collective bargaining agreement between the vessel and the union of which plaintiff was a member. MTC's ship superintendent, James Mournighan, testified without contradiction that the stevedore company was responsible for all housekeeping chores, that company and federal regulations required the stevedore company to stop work if an unsafe condition arose, that the stevedore company would continue to charge the ship for "down time" while the work areas were being cleaned and that it was the responsibility of the stevedore hatch foreman and the longshoremen to keep the work areas clean as the work progressed. *See, e. g.,* 29 CFR §§ 1918.2 and 1918.91(c). He also acknowledged it was the responsibility of the stevedore company to eliminate slippery conditions as they were created and to refuse to work unless the work areas were "reasonably safe."

Approximately eight to twelve minutes before plaintiff's accident occurred, plaintiff and his partner swept the work areas. They then loaded two more loads of sacks, which then were removed from the hatch. As they loaded the sacks, more powder leaked onto the deck. However, they did not sweep up after each load, and approximately one-half inch of slippery powder accumulated on the deck. While plaintiff and his work partner were handloading the next pallet board, plaintiff picked up a sack, stepped toward the pallet board, slipped in the powder and sustained a low back injury which disabled him for approximately ten months and has allegedly caused partial disability ever since.

James Mournighan, MTC's superintendent, testified without contradiction that the sacks could have ripped at sea from other pallets digging into them. He testified that if that were the case, it would have been better practice to have used a dunnage floor or plywood to separate the palletized cargo from the sacks. However, he also admitted that the last persons to handle the cargo in Japan would have been the stevedores, and the first persons to handle the cargo at Wilmington port were MTC longshoremen. Mournighan admitted he did not know the actual cause of the ripping and that it was just as likely they ripped during loading or unloading by stevedores as by pallets digging into the load while the vessel pitched and rolled at sea. Moreover, Mournighan was unable to state that the vessel's officers or crewmen had anything to do with the loading of the palletized tiles atop the sacks or that the officers made any decisions whether or not to use dunnage or plywood to separate the pallets from the sacks. Plaintiff placed in evidence three cargo plans. Two of them were preliminary plans prepared by the Japan Tally Corporation of Nagoya, Japan, and the Shin Yang Shipping Service Agencies, Ltd., Pusan, Korea. These plans suggested the pallets were to be stowed atop the sacks. But there was no proof that the ship had any financial relationship to either of these corporations and there was no proof that the ship ever saw these plans before the cargo was stowed. Plaintiff introduced a final cargo plan signed by the vessel's master and chief officer. However, this cargo plan was signed after the cargo was loaded. This plan did

not show the tiles stowed atop the sacks. Rather, it merely showed the general location of the respective cargos.

Plaintiff made two contentions at trial: First, he contended the ship knew or should have known that the palletized crates of tile were stowed atop the stow of sacks and that it was likely the pallet boards would cut into the sacks during an ocean voyage. Plaintiff claimed, and one of his witnesses testified, that the ship should have supervised through its chief officer the details of the loading and should have insisted that the stevedore companies in Nagoya and Yokohama use dunnage or plywood to separate the stows. Second, plaintiff contended the ship knew or should have known there was a likelihood the sacks would leak powder on the deck and should have warned plaintiff of the hazard or taken steps to correct the condition.

At the close of plaintiff's case on liability, the parties stipulated to bifurcate the issues of liability and damages. Defendant moved for a directed verdict under Rule 50 of the Federal Rules of Civil Procedure.

After reviewing all of the evidence in a light most favorable to plaintiff, the Court finds: (1) there was no evidence the ship through its chief officer knew, or had any reason to know, there was anything unsafe about the stow; (2) there was no proof the condition of the stow actually caused the sacks to rip and leak powder; (3) there was a failure of proof that the proximate and legal cause of the accident was the leakage of powder as distinguished from the failure of the stevedore company to clean it up; (4) there was no evidence the vessel officers or crew knew of any dangerous condition of the cargo before plaintiff's accident occurred; and (5) even assuming the vessel knew of a dangerous condition of its cargo, the vessel had no duty to warn plaintiff or his fellow longshoremen of the hazard which was known to plaintiff and the longshoremen at least 24 hours before the accident occurred and which the longshoremen could and should have remedied.

This case is governed by the uniform principles of federal maritime law, which have evolved from the numerous decisions which have interpreted the 1972 amendments to the Longshoremen's and Harbor Worker's Compensation Act (Amended), 33 U.S.C. § 901 *et seq.*, which eliminated a longshoreman's cause of action against a vessel for breach of the warranty of seaworthiness and in return provided the longshoreman with vastly increased compensation benefits recoverable from his stevedore employer regardless of fault. The Act, however, reserved to the longshoreman a cause of action for negligence against the ship owner. The applicable statute is 33 U.S.C. § 905(b):

> In the event of injury to a person . . . caused by the negligence of a vessel, then such person, . . . may bring an action against such vessel as a third party . . . . The liability of the vessel . . . shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred.

Plainly, a ship owner can be held liable only for its own actual negligence. Notions of "strict liability," "safe place to work," and "non-delegable duty" do not apply. *Bess v. Agromar Line,* 518 F.2d 738 (4th Cir. 1975); *Wescott v. Impresas Armadoras, S.A. Panama,* 564 F.2d 875, 882 (9th Cir. 1977); *Cox v. Flota Mercante Grancolombiana, S.A.,* 577 F.2d 798 (2d Cir. decided May 10, 1978). In the six years that have elapsed since Congress amended the Act, the federal courts have abolished any concept of a vessel's strict liability or vicarious liability for the fault of the stevedore company. In more than forty decisions, federal maritime courts have redefined the duty that the vessel owner owes a longshoreman injured aboard a merchant vessel during the course and scope of his employment. Under these cases, the ship owner has a duty to exercise ordinary care to have his vessel in such condition that when it turns the ship over to the expert stevedore company in port, the stevedore company and its longshoremen, mindful of the dangers they might reasonably encounter in a vessel which is subject to the perils of the sea, will be able in the exercise of ordinary care to work the vessel with reasonable safety. *Kelleher v. Empresa Hondurena de Vapores S.A.,* 57

Cal.App.3d 52, 59, 129 Cal.Rptr. 32 (1976); *Crowshaw v. Koninklijke Nedlloyd,* 398 F.Supp. 1224, 1229 (D.Or.1975); *Frasca v. Prudential Grace Lines,* 394 F.Supp. 1092, 1098–1102 (D.Md.1975). However, the primary responsibility for the proper and safe conduct of the work rests upon the stevedore company and its longshoremen. *Brown v. Ivarans Rederi,* 545 F.2d 854, 860 (3d Cir. 1976); *Marant v. Farrell Lines, Inc.,* 550 F.2d 142, 144 (3d Cir. 1977); *Kelleher v. Empresa Hondurena de Vapores, S.A., supra,* 57 Cal.App.3d at 60, 129 Cal.Rptr. 32. The ship owner is not liable for the negligence of the stevedore company or its longshoremen, and its duty of ordinary care does not require it to supervise the expert stevedore company in the loading or unloading of cargo to see that the stevedore company carries out its responsibilities. *Brown v. Ivarans Rederi, supra; Slaughter v. S.S. Ronde,* 390 F.Supp. 637, 646–47 (S.D.Ga. 1974), *aff'd per curiam,* 509 F.2d 973 (5th Cir. 1975); *Wiles v. Delta Steamship Co.,* 1976 A.M.C. 2646 (E.D.La.1976); *Marant v. Farrell Lines, Inc., supra; Brown v. Mitsubishi Shintaku Ginko,* 550 F.2d 331 (5th Cir. 1977); *Hurst v. Triad Shipping Co.,* 554 F.2d 1237 (3d Cir. 1977). Accordingly, the ship owner's duty to exercise ordinary care is limited to warning the stevedore company of any latent or hidden defective conditions on the vessel of which the owner knows or should know in the exercise of ordinary care. *Cox v. Flota Mercante Grancolombiana, S.A., supra; Wescott v. Impresas Armadoras, S.A., Panama, supra,* 564 F.2d at 875. However, the ship owner's duty to exercise ordinary care does not require it to warn or protect the stevedore company or the longshoremen against dangers of which the stevedore company knows or should know in the exercise of its duties. *Cox v. Flota Mercante Grancolombiana, S.A. Panama, supra; Anuszewski v. Dynamic Mariners Corp.,* 391 F.Supp. 1143 (D.Md.1975), *aff'd per curiam,* 540 F.2d 757 (4th Cir. 1976); *Hite v. Maritime Overseas Corp.,* 380 F.Supp. 222, 227 (E.D.Tex.1974); *Wescott v. Impresas Armadoras, S.A. Panama, supra; Davison v. Pacific Inland Nav. Co.,* 569 F.2d 507 (9th Cir. 1978). As a result of this rule, if the stevedore company or its longshoremen choose to proceed with their work in spite of the existence of a known dangerous condition on board the ship, there is no basis for placing any liability upon the ship owner. *Wescott v. Impresas Armadoras, S.A. Panama, supra,* 564 F.2d at 883. In cases such as the case at bar, the ship owner has no obligation to discover hidden defects in the stow after the ship has been loaded. *Munoz v. Flota Mercante Grancolombiana,* 553 F.2d 837, 840 (2d Cir. 1977); *Valle v. Jugoslavenska Linejska Plovidba,* 434 F.Supp. 608, 611 (S.D.N.Y.1977).

Applying the uniform standards articulated in the foregoing maritime authorities decided since the passage of the 1972 amendments, there is no basis for imposing liability upon the shipowner. There is no evidence the vessel participated in the loading of the cargo in Japan. There is no evidence the vessel dictated, or had the right to dictate in the seaports of Japan, the exact, detailed manner in which the stevedores loaded the cargo. There is no evidence the vessel had any knowledge prior to loading that the palletized crates of tile were to be loaded on top of the sacks. There is no evidence shifting of the palletized cargo actually caused the sacks to rip. In fact, the undisputed evidence is that the last persons to handle the sacks were the loading stevedores in Japan, and the first persons to handle the sacks thereafter were plaintiff and his fellow longshoremen, all employees of MTC. It is undisputed that there was no spillage on the deck until after MTC's forklift driver physically removed the palletized crates from atop the sacks. In the absence of any proof the vessel officers or crew knew, or in the exercise of ordinary care should have known, of the existence of a dangerous, hidden condition in the stow, there is no basis for imposing any liability upon the vessel's owner. *Cox v. Flota Mercante Grancolombiana, S.A., supra; Keith v. S.S. Goldstone,* 81 Cal.App.3d 699, 146 Cal.Rptr. 639 (1978).

Even assuming the vessel's officers or crew knew of the condition of the stowed cargo, knew that it presented a risk that the sacks would leak powder and knew that

the risk had materialized, there is no basis for placing any liability on the ship where, as here, the stevedore company, which was hired to discharge the cargo safely, knew of the existence of the unsafe condition at least 24 hours in advance and did not take effective steps to correct it. This holding is consistent with the recent case of *Cox v. Flota Mercante Grancolombiana, S.A., supra,* in which a longshoreman was injured when a hatch beam, which both the ship's officers and the stevedore company knew was inadequately secured, dislodged and fell into the hold of the vessel, striking plaintiff. One of the ship's officers had agreed to remedy the dangerous condition, but failed to do so. The stevedore, mindful of the loose beam, nevertheless continued to work. Thereafter, the beam dislodged, fell and struck plaintiff. The district court submitted the case to a jury, which rendered a verdict in favor of plaintiff. The Second Circuit reversed and entered judgment in favor of the shipowner, holding that

> It makes no difference here whether the alleged defect was latent or open and obvious. In either case, the situation was known to the stevedore. The stevedore from its inception had complete charge of the unloading operation. Only it could give orders to its employees . . . . If the beam was dislodged by cargo being hoisted out of the hold . . . , then the cause of the accident was an operation entirely in the hands of the stevedore. It was the stevedore which had exclusive control of the gang and how, when and where they worked. (footnote deleted)

The court concluded, "In view of the overwhelming decisional authority and the conclusions therefrom that the shipowner had no duty to supervise the operation entrusted to the stevedore alone, the judgment must be reversed and the complaint dismissed (footnote)."

A similar result was reached by this circuit in the case of *Wescott v. Impresas Armadoras, S.A. Panama, supra,* where the stevedore and its longshoremen, aware that the ship lacked proper fittings on which to secure tag lines on a grain chute, went ahead with the work while plaintiff and his partner held the tag lines in their hands. The pan whipped back and forth several times, causing plaintiff to fall and sustain injury. The district court submitted the matter to a jury, which entered a verdict in favor of plaintiff. The Court of Appeals reversed and directed that judgment be entered in favor of defendant on the grounds that the ship owed no duty to warn the stevedore company or its longshoremen of a condition which was as easily observable by the stevedore company as it was by the ship. 564 F.2d at 882–83.

Here, plaintiff was required to prove that the shipowner created a dangerous condition which caused plaintiff's accident or knew or should have known of the existence of a hidden defect which was unknown to the stevedore company. He did not. Hence, there is no basis for imposing liability upon the shipowner. Even assuming the vessel knew of the dangerous conditions arising in the hatch during cargo operations, there can be no basis of liability against the vessel where such conditions were known to the longshoremen, who proceeded with the work without taking appropriate precautions. Any other result would resurrect the warranty of seaworthiness which Congress abolished in the 1972 amendments to the Act.

Accordingly, IT IS ORDERED that judgment be entered in favor of defendant and against plaintiff, defendant to recover its costs.