[Civ. No. 53201. Second Dist., Div. Four. Mar. 19, 1979.]

JOHN PROHOROFF, Plaintiff and Respondent, v.
KAWASAKI KISEN KAISHA, LTD., Defendant and Appellant.

**COUNSEL**

Graham & James and Thomas A. Vyse for Defendant and Appellant.

Richard Devirian for Plaintiff and Respondent.

**OPINION**

**JEFFERSON (Bernard), J.**—Plaintiff John Prohoroff brought an action for personal injuries against defendant Kawasaki Kisen Kaisha, Ltd., a corporation, pursuant to section 905(b) of the Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C. § 901 et seq.), hereinafter sometimes referred to as LHWCA. Continental Insurance Company filed a complaint in intervention, seeking reimbursement from defendant for compensation benefits provided Prohoroff.

Trial was by jury. A special verdict was returned; the jury found defendant liable to plaintiff in the amount of $318,000 because of the defendant's negligence, and that compensation benefits of $29,058.36 had been provided to plaintiff by the complainant-in-intervention. Ten percent of the combined negligence of plaintiff and defendant was attributed to plaintiff. Defendant made motions for judgment notwith-

standing the verdict and for a new trial; both motions were denied. Judgment was accordingly entered awarding plaintiff $283,294.16 and Continental $29,058.36.

Defendant has appealed from the judgment.

## I

### The Procedural Background

The accident occurred on April 14, 1974, on the deck of defendant's vessel, the *Golden Gate Bridge,* as it was docked at Pier 232 in Los Angeles-Long Beach Harbor.

Plaintiff Prohoroff, a longshoreman employed by International Transportation Service, Inc., a stevedore company, came aboard the vessel at 8 a.m., as part of a crane gang consisting of four longshoremen (including himself), two crane drivers and the hatch boss, Shoults. All of these individuals were in the employ of International, and were supervised by more senior members of International.

Prohoroff's assigned task was to place cones in containers which were to be placed in the hatches; he was unable to proceed, however, because a container which fitted under the pontoon closing one of the hatches was too high. At some time before 8:30 a.m., plaintiff was standing on a bay five feet above the deck and observed a Japanese crewman greasing turnbuckles located in the thwartship passageway between two hatches; this crewman was slopping grease on the turnbuckles; it took the crewman approximately seven to ten minutes to complete this task.

Subsequently, Prohoroff entered the passageway and, as he placed his foot on what was referred to at trial as a crescent stiffener, i.e., a crescent-shaped cutout of the girder running along the hatches providing access through the passageway, he slipped in some grease on the stiffener. Prohoroff testified that the grease in which he slipped was similar to that which had been applied earlier to the turnbuckles by the crewman. Plaintiff fell and sustained what turned out to be a severe and permanent injury to his lower back. At the time of his fall, he was able to rise, wipe up the grease, and leave the vessel. He filled out an injury report and went to a hospital for treatment. Three witnesses testified for plaintiff. Witness Holland saw plaintiff get up and saw him wiping something up with his glove; witness Valles had also observed the greasing operation;

witness Flores saw the fall and saw plaintiff clean up something after getting up.

At the time of the accident, plaintiff was a 38-year old longshoreman with many years of experience; he had not completed high school but had spent his working life as a longshoreman, often working extra shifts when they were available. He had two minor children. After the accident, plaintiff was largely incapacitated for 19 months; he had lower back surgery in July 1974. In January 1976, against medical advice, he returned to work. He had refused a second surgery—needed to stabilize his lower back; this was according to medical testimony. Plaintiff had been urged to seek less strenuous employment; at the time of trial, he was losing two days work a week due to continuous lower back pain and was restricted on the job to lighter assignments. His pain was constant, necessitating four codeine pills a day. The medical prognosis indicated that he would cease being able to continue to work as a longshoreman sometime within the next five years, or before he was 43 years of age.

Defendant introduced the testimony of the hatch boss, Shoults, whose account of events surrounding the accident differed sharply from that of other witnesses. Also testifying for defendant was Wetmore, an expert on maritime practices. Wetmore offered the opinion that the greasing of turnbuckles was an activity usually conducted at sea rather than in port when stevedoring operations were commencing. No employee of the vessel was called as a witness. As indicated, the jury returned a substantial verdict in favor of plaintiff.

II

*Background Discussion of Federal*
*Maritime Law*

■ In considering defendant's contentions on this appeal, we note first of all that the case is governed by applicable principles of federal rather than California law. (*Pope & Talbot, Inc.* v. *Hawn* (1953) 346 U.S. 406, 409-410 [98 L.Ed. 143, 150-151, 74 S.Ct. 202].) Maritime tort law is inherently federal and should be uniform, applying the same standards regardless of the location where the injury has occurred. (*Kermarec* v. *Compagnie Generale.* (1959) 358 U.S. 625 [3 L.Ed.2d 550, 79 S.Ct. 406].) However, this goal of uniformity has not been realized in the appellate courts of the federal system, at least insofar as defining the scope of the longshoreman's cause of action for negligence against a vessel owner. We

undertake the task of ascertaining the concepts and the principles acceptable in the federal courts of the Ninth Circuit, which encompasses matters of federal jurisdiction in California (*Keith* v. *S.S. Goldstone* (1978) 81 Cal.App.3d 699, 704 [146 Cal.Rptr. 639]), recognizing that there are even divergent approaches within the Ninth Circuit. (*Davis* v. *Inca Compania Naviera S.A.* (W.D. Wash. 1977) 440 F.Supp. 448, 451-452.)

Some background discussion is required. Prior to 1972, the judicial development of the doctrine of "seaworthiness" had imposed upon the vessel owner what amounted to absolute liability in tort for injuries sustained by a longshoreman aboard a vessel; the vessel owner's duty to render the vessel safe was perceived to be so broad that longshoremen who were injured there usually recovered judgment. This occurred despite the fact that often the negligence or the dangerous condition involved was actually attributable to the stevedore, the independent contractor with the vessel owner. The stevedore was the employer of the longshoreman and was charged with loading or unloading the ship. (*Seas Shipping Co.* v. *Sieracki* (1946) 328 U.S. 85 [90 L.Ed. 1099, 66 S.Ct. 872].) Prior to 1972, the stevedore faced liability for the injury to a longshoreman on two fronts: the stevedore was responsible for payment of compensation benefits to its employee and was often required, after an indemnity action by the vessel owner, to pay to the owner the damages in tort which said owner had become obligated to pay the longshoreman. (*Ryan Co.* v. *Pan-Atlantic Corp.* (1956) 350 U.S. 124 [99 L.Ed. 641, 75 S.Ct. 41].)

III

*The Change in the Seaworthiness-
of-the-Vessel Doctrine*

In 1972, Congress decided to revamp the entire structure of tort liability in this area by amendments to the Longshoremen's and Harbor Workers' Compensation Act. As a result, the duty of a vessel owner to maintain the "seaworthiness" of the vessel was discarded as a basis upon which a longshoreman's tort suit could be prosecuted. The primary responsibility for the safety of longshoremen aboard the vessel was shifted from the vessel owner to the stevedore—the longshoreman's employer. (*Ramirez* v. *Toko Kaiun K.K.* (N.D. Cal. 1974) 385 F.Supp. 644.) The longshoremen benefited by the amendments because they enjoyed greatly expanded compensation benefits if hurt on the job. While

the stevedore employer was obligated to pay these benefits, the stevedore was no longer subject to a suit for indemnity by the owner of the vessel.

## IV

### *The Liability of the Vessel Owner to Longshoremen for Negligence— Limited to Certain Types*

However, Congress did not totally terminate the legal responsibility of the vessel owner to meet some standard of due care with respect to longshoremen; it enacted a statute (33 U.S.C. § 905(b)), which provided, in pertinent part for the issue before us, that "[i]n the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, . . . may bring an action against such vessel . . . ." In enacting this section, Congress did not further delineate the scope of this negligence action, leaving that duty to the federal courts. In one legislative report, however, Congress declared that "[p]ermitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work." (H.R.Rep. No. 92-1441, 92d Cong., 2d Sess., reprinted 1972 U.S. Code Cong. & Admin. News, pp. 4698, 4703-4704.)

The reference by Congress to "land-based" concepts of tort law has influenced some federal courts to attempt application to the vessel owner of the land-based common law negligence concepts set forth in Restatement Second of Torts, sections 342, 343 and 343A. It has also been stated that "the shipowner is subject to liability if it knows of, or has reason to know of, a condition on the vessel, should realize that the condition involves an unreasonable risk of harm to a longshoreman, should expect that the longshoreman will not discover or realize the danger, and fails to exercise reasonable care to make the condition safe or warn the longshoreman of it." (*Samuels* v. *Empresa Lineas Maritimas Argentinas* (5th Cir. 1978) 573 F.2d 884, 886.)

Other courts have emphasized that the thrust of the 1972 amendments was the shifting of responsibility for safety to the stevedore away from the vessel owner. As analyzed in *Kelleher* v. *Empresa Hondurena De Vapores, S.A.* (1976) 57 Cal.App.3d 52, 58-59 [129 Cal.Rptr. 32], "[t]he federal law delineates the duty of a ship to longshoremen, . . . in a much narrower scope than the duty of a California land occupier to persons on his

premises. . . . [¶] There is not a nondelegable duty on the part of the ship or her owners to provide the longshoreman with a safe place to work, . . . Rather, the ship and her agents have a duty to refrain from active negligence, to warn or take corrective action where they know or should know of a latent dangerous condition [citation] or of a patent dangerous condition which a reasonable person should anticipate as imposing an unreasonable risk of harm to one on notice of it [citation], and to have the ship in a reasonable condition for use by the stevedore company in light of its expertise. [Citation.] Ordinarily, the ship and her owners have no duty to warn of, or remedy, a dangerous condition which is obvious or which would be obvious if ordinary care were observed by the longshoreman or his superiors in the stevedore company. [Citation.] The ship and her owners owe no duty to protect against dangerous conditions arising during performance of the stevedore's work. [Citation.]"

The narrowness of the vessel owner's liability to longshoremen, recognized as such for different reasons in the federal case law, has more often than not precluded successful prosecution of a negligence action against the vessel by the longshoreman. However, the various approaches that have been utilized have not been regarded as totally satisfactory. (*Wescott* v. *Impresas Armadoras, S.A. Panama* (9th Cir. 1977) 564 F.2d 875; see Note, *The Injured Longshoreman* vs. *The Shipowner After 1972* (1977) 28 Hastings L.J. 771.)

Our inquiry turns to what constitutes the kind of negligence for which a ship owner may be liable under present law as construed by the courts. A recent federal district court case attempts in a long and thoughtful discussion to set some parameters for these negligence actions. In *Gallardo* v. *Westfal-Larsen & Co. A/S* (N.D.Cal. 1977) 435 F.Supp. 484, 490, the court declared the principle that "[b]efore the commencement of stevedoring operations, the owner of a vessel in navigable waters has a duty to take reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual or constructive knowledge. After the commencement of stevedoring operations, the owner of a vessel in navigable waters has a duty to take reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual knowledge."

Defendant herein relies upon this statement in *Gallardo,* contending that plaintiff did not establish negligence on the part of the defendant because he failed to prove that defendant had actual knowledge of the presence of grease on the deck during stevedoring operations.

Unlike the case at bench, however, *Gallardo* was not concerned with the situation where, by direct evidence, plaintiff has identified an employee of the vessel as the creator of the dangerous condition involved. Creation of a dangerous condition involves affirmative acts, conduct which constitutes active negligence. In its subsequent discussion, *Gallardo* employs as an example where liability may be imposed on the shipowner a situation which is also set forth in congressional reports on the subject: "So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments . . . would still permit an action against the vessel for negligence. To recover he must establish that: 1) *the vessel put the foreign substance on the deck,* or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances." (*Gallardo, supra,* 435 F.Supp. 484, 493.) (Italics added.)

It is apparent that the timing of the creation of the dangerous condition is of critical importance. (See *Davis, supra,* 440 F.Supp. 448, 451, 452.) In *Frasca* v. *Prudential-Grace Lines, Inc.* (D.Md. 1975) 394 F.Supp. 1092, a slip and fall case, an accident was occasioned by the presence of oil on a ladder used by longshoremen including the injured plaintiff; recovery was denied because the accident happened many hours after the film of oil on the ladder was evident to the persons using the ladder—an "obvious" danger. The *Frasca* court observed that "[c]learly, if the accident had occurred in the early morning upon the first descent down the hatch, a jury could find the shipowner liable. . . ." (*Id.,* at p. 1101.)

In the case at bench, plaintiff's evidence established that stevedoring activity was just commencing at the time the defendant's employee spilled the grease on the deck. The fall occurred within minutes of this event. In contrast to much of the other case law in this area, the facts in the case before us do not show that the stevedore had any knowledge of the condition or any opportunity to remedy it, circumstances which normally would shift the legal responsibility to the stevedore. The situation is singular in the sense that plaintiff's evidence precisely delineates the type of *affirmative negligence* on the part of a vessel owner that does not interdict liability under federal law.

We cannot, of course, reweigh the evidence accepted by the jury, nor can we independently assess the credibility of the witnesses who testified

to these events. (*Samuels* v. *Empresa Lines, supra,* 573 F.2d 884.) We conclude that, under all of the circumstances, present federal law allows recovery by the plaintiff in the case before us.

Defendant advances the theory that, as a matter of law, the stevedore, International, was responsible for the dangerous condition on the deck, referring us to the Safety and Health Regulations for Longshoring promulgated by the United States Department of Labor, specifically section 1918.91(c), which provides that "[s]lippery conditions shall be eliminated as they occur." This duty, imposed upon the stevedore by safety regulation, would no doubt preclude liability on the part of the vessel owner under many circumstances. Thus, we have indicated that the stevedore is primarily responsible for conditions aboard a vessel while it is loading or unloading the vessel. But the duty reflected in the regulation simply has no application to the facts of the case before us where the dangerous condition created by the vessel employee was not known to the stevedore and caused the injury before sufficient time had passed for the condition to become known to the stevedore; the passage of time, without inspection of the deck, could well have, under appropriate circumstances, given rise to the duty to maintain safe conditions on board which is generally imposed upon the stevedore.

V

*The Jury Instructions*

Defendant also complains of certain jury instructions offered by both plaintiff and defendant and given by the trial judge, declaring that they are in conflict and misled the jury. We note the difficulties attendant in making fair and adequate instructions for the jury in an area of the law which has in the past been replete with contrary and confusing signals.

Plaintiff's instruction No. 2 declared that: "The duty imposed by law upon the vessel owner in this case to longshoremen lawfully aboard its vessel is as follows: [¶] 1. To make the vessel, decks, and equipment thereon reasonably safe for the intended and the foreseeable use; [¶] 2. To warn persons thereon of any latent or concealed dangers known to the vessel owner or which might have been known by the exercise of ordinary care; and [¶] 3. To guard against possible dangers by the reasonable inspection of the vessel, decks and equipment thereon."

Plaintiff's instruction No. 4 told the jury: "The vessel owner is subject to liability for physical harm caused to longshoremen by a condition on the vessel if, but only if, [the vessel owner] [¶] a. knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such longshoremen, and [¶] b. should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and [¶] c. fails to exercise reasonable care to protect them against the danger."

Defendant's instruction No. 20 reminded the jury that "[t]he primary responsibility for the safety of the longshoreman lies with the stevedoring company because it is in the position best to provide for the safe loading or unloading of a ship." In addition, defendant's instruction No. 21 apprised the jury of the federal safety regulation mandating that slippery conditions shall be eliminated [by the stevedore] as they occur.

We see no fatal conflict here between the instructions. The instructions constituted an attempt, even though somewhat imperfectly, to delineate the areas of responsibility aboard a vessel imposed on the vessel owner and the stevedore, respectively, under the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act. Plaintiff's instructions correctly informed the jury that the vessel owner's responsibility was very limited indeed; defendant's instructions emphasized that the primary responsibility rested upon the stevedore.

Defendant also argues that the instructions ran contrary to the opinions expressed in *Gallardo,* in that they employed "land-based" concepts of common law negligence—concepts rejected by the *Gallardo* court. We recognize that *Gallardo* criticized the use of such concepts on the basis that an incorrect application thereof results in unfairness to an injured *longshoreman,* due to the introduction of what amounts to the element of assumption of risk. We do not find that the instructions to the jury in the instant case fall within the *Gallardo* criticism of an incorrect application of land-based concepts of common law negligence.

■ Defendant also asserts that the general description employed in plaintiff's instruction No. 2, declaring that the vessel owner has a duty to "make the vessel . . . reasonably safe . . ." comes dangerously close to espousing the discarded doctrine of the duty to make a vessel "seaworthy" and, therefore, is an incorrect statement of the law. This

instruction cannot be considered alone, without reference to the other instructions. Obviously, if a vessel owner has no duty, under any circumstances, to maintain a safe vessel, the cause of action retained by Congress in section 905(b) is an empty one; on the other hand, the existing duty *is* subject to severe restriction vis-a-vis the stevedore—the existence of the duty depends upon the circumstances of the injury.

Such an instruction may properly be given only if accompanied by other instructions appropriate to the case which more specifically define the parameters of the duty. The phrase "reasonably safe" does not import the absolute liability of "seaworthiness" when accompanied, as it was herein, with an instruction on the primary responsibility of the stevedore. As a *generally* descriptive statement of the vessel owner's duty, such an instruction was not erroneous. (See *Davison v. Pacific Inland Nav. Co., Inc.* (9th Cir. 1978) 569 F.2d 507, 512; cf. *Keith, supra,* 81 Cal.App.3d 699, 708.)

VI

*Damages—Were They Excessive?*

Defendant advances the contention that the damages which were awarded plaintiff were excessive, arguing that the evidence presented on plaintiff's earnings established that plaintiff was, at the time of trial, earning at an annual rate, an amount which exceeded the rate in effect before his injury.

Evidence was presented that the rate of pay for longshoremen between the time of the accident and the time of trial had *doubled.* It was also established that plaintiff was not working every day at time of trial due to the restrictions imposed upon such endeavor by the permanent and severe injury to his back. The medical prognosis was to the effect that plaintiff would soon be limited to part-time sedentary employment for which he had no training or experience.

Since plaintiff's life expectancy was 22 years, and he was potentially unemployable within 5 years of the time of trial, his loss of future earnings, even taking the minimum figure of the 1974 actual earnings of $18,900 and projecting them into the future, could have reasonably resulted in a jury verdict exceeding the amount of total damages found by

the jury—$318,000. In addition, the jury properly considered such elements as past medical expense, probable future medical expense and pain and suffering. We must reject defendant's contention that the jury's award of damages was excessive.

The judgment is affirmed.

Kingsley, Acting P. J., and Alarcon, J., concurred.