[Civ. No. 58176. Second Dist., Div. One. May 23, 1980.]

GILBERT A. BAPTISTE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
CHEVRON SHIPPING COMPANY, Real Party in Interest.

COUNSEL

Silver & McWilliams, Lawrence R. Booth, Donna Silver and Leonard Sacks for Petitioner.

No appearance for Respondent.

Lawler, Felix & Hall, Thomas E. Workman, Jr., Jane H. Barrett and Mary J. Bush for Real Party in Interest.

OPINION

JEFFERSON (Bernard), P. J.— This petition for mandate compels resolution of the question of whether Gilbert A. Baptiste, the petitioner (hereinafter plaintiff), who is prosecuting in the superior court a maritime tort action against his corporate employer, Chevron Shipping Company (Standard Oil Company of California), real party in interest before us (hereinafter defendant), may there seek an award of punitive damages in addition to other relief. As we shall articulate, we have determined that petitioner may do so.

I

*The Procedural Facts*

Plaintiff filed a personal injury complaint in the superior court on December 4, 1974, in which he sought damages from defendant pursuant to the Jones Act[1] and general maritime law. He alleged that he had been employed by defendant from 1966 to 1974 as a seaman on various vessels owned and operated by defendant in navigable waters, and had sustained injuries due to defendant's negligence and failure to provide and maintain the seaworthiness of the vessels upon which plaintiff had worked.

In a second cause of action, plaintiff alleged that he was entitled to damages for maintenance and cure, and that defendant had "failed and refused to furnish plaintiff with the same." Plaintiff sought general

---

[1] 46 United States Code section 688, added by the Merchant Marine Act of 1920, section 33, but commonly referred to as the Jones Act. The pertinent section will be set forth in full, *infra*.

damages of $200,000, maintenance and cure damages of $5,000, and damages according to proof for medical expenses, loss of earnings, costs of suit, and "[f]or such other and further relief as the Court deems proper."

Defendant's answer, denying liability, was filed February 12, 1975; thereafter discovery was pursued. In 1979, plaintiff received some documents from defendant which caused plaintiff to reevaluate his case.

On August 14, 1979, plaintiff moved to amend his complaint to include allegations concerning his entitlement to punitive damages; the proposed amendment sought $200 million in punitive damages and $1 million in general damages. Accompanying the motion were certain copies of documents received from defendant and the affidavit of plaintiff's counsel which revealed that in 1970 defendant was informed and made aware of the fact that there were impermissibly high noise levels in the engine rooms of two of defendant's ships, described as "five to 10 times [a man's] suggested allowable daily exposure limit" and that "[c]ontinued unprotected exposure at these levels will result in a gradual but permanent loss of hearing." In 1971, a similar problem was detected on a third vessel. The recommendation to defendant was that "[i]mmediate steps should be taken to reduce noise exposures. Personal hearing protection should be provided and its use required until noise reduction is achieved."

In 1972, it had been determined that the impermissibly high noise levels that permeated the engine rooms resulted from gears in the engine rooms of the affected vessels; certain financial projections were made with respect to the alternatives available to reduce the noise; the cost of reduction ranged from $800 per vessel to $6,500 per vessel, the latter estimate constituting the cost of gear replacement. It was pointed out, however, that "the cheapest solution...is to provide and enforce use of earphones while in the engine room." Shortly thereafter the alternatives were again listed, and ear plugs for the seamen were recommended due to the "short remaining life" of the vessels involved. On October 31, 1972, a directive was issued to the masters of defendant's ships requiring that warning signs be posted in the engine rooms and that ear plugs or muffs be worn by all personnel while on duty there.

According to the declaration of plaintiff's counsel, plaintiff had served on ships in the same fleet as those tested, of the same vint-

age—in service since World War II. Plaintiff, and other seamen, had not only worked in the engine rooms of these vessels but had lived in close proximity to them while not on duty. Plaintiff had discovered in 1974 that he was becoming deaf, and had instituted this action, but, until 1979, was unaware of defendant's specific knowledge of the dangerous condition in the engine rooms and the actions taken as the result of that knowledge.

The amended complaint alleged that defendant had "willfully, wantonly, intentionally and with reckless disregard for the safety of the plaintiff and other seamen employed by said defendant, permitted extremely high noise levels to exist in the environment in which the plaintiff and other seamen were required to work, with full knowledge that such noise would cause permanent hearing loss to said plaintiff and others."

On August 30, 1979, the trial court granted plaintiff's motion to amend the complaint. Defendant then filed a motion to strike the amended allegations which set forth plaintiff's entitlement to punitive damages, on the ground that, "as a matter of law punitive damages are not recoverable in an action pled pursuant to the Jones Act and doctrine of unseaworthiness."

On November 5, 1979, the trial court granted defendant's motion to strike, declaring that "[i]n this regard the Court notes the following: (a) federal law is applicable; (b) there is no authority for punitive damages in a maritime case, though there is some dicta to that effect; (c) in the absence of maritime law on this subject, FELA cases are the most persuasive available authority; (d) punitive damages are not allowable in FELA cases; (e) extensions of substantive law, regardless of their desirability, are better left to the appellate courts—the judicial system functions more effectively if litigants can, at the trial court level, rely on what appears to be the existing status of the law."

Plaintiff then sought a writ of mandate in the appellate court, seeking to have vacated the order granting the motion to strike and to have reinstated the punitive damages allegations. The writ was denied. Plaintiff then sought a hearing before the California Supreme Court; on February 20, 1980, the high court granted plaintiff's petition for a hearing and ordered the matter transferred to this court, with directions for us to issue an alternative writ and place the matter on calendar. This was done on March 3, 1980. We now consider the matter on the merits.

## II

### *Jurisdiction to Entertain Jones Act and General Maritime Law Actions*

State courts have concurrent jurisdiction with federal courts to entertain and try actions pleaded pursuant to the Jones Act and the general maritime law. Federal jurisdiction is derived from article III, section 2 of the United States Constitution, which confers that jurisdiction on "United States Courts" over "all cases of admiralty and maritime jurisdiction."

Section 1333 of title 28 of the United States Code provides for *exclusive* federal jurisdiction in admiralty cases with the exception of "saving to suitors in all cases all other remedies to which they are otherwise entitled." The exception allows such litigants as plaintiff to pursue recovery in a state court. (See *Engel* v. *Davenport* (1926) 271 U.S. 33 [70 L.Ed. 813, 46 S.Ct. 410].)

The prevailing rule is that, regardless of the forum, federal substantive law applies. Numerous United States Supreme Court cases have discussed this principle—e.g., *Engel, supra; Garrett* v. *Moore-McCormack Co.* (1942) 317 U.S. 239 [87 L.Ed. 239, 63 S.Ct. 246]; *Pope & Talbot, Inc.* v. *Hawn* (1953) 346 U.S. 406 [98 L.Ed. 143, 74 S.Ct. 202]; *Kermarec* v. *Compagnie Generale* (1959) 358 U.S. 625 [3 L.Ed.2d 550, 79 S.Ct. 406]. The rationale is the perceived need for uniformity in maritime tort law, regardless of the place of injury or forum of trial. In addition, it has been of historical importance to fashion and apply federal law liberally with protection of the rights of injured seamen as the goal; as a consequence, some obstacles traditionally posed by state law have been avoided.

The California courts have recognized that, in the area of maritime torts, their task has been that of ascertaining and applying appropriate legal principles derived from the considerable body of federal maritime law that has developed in the United States. (See, e.g., *Dixon* v. *Grace Lines, Inc.* (1972) 27 Cal.App.3d 278 [103 Cal.Rptr. 595]; *Catania* v. *Halcyon Steamship Co.* (1975) 44 Cal.App.3d 348 [118 Cal.Rptr. 513].) As with any body of law, conflicts and confusing signals may exist within it; it remains the task of the reviewing court to explicate and determine the issues presented. (See, e.g., *Prohoroff* v. *Kawasaki Kisen Kaisha, Ltd.* (1979) 90 Cal.App.3d 640, 644-645 [153 Cal.Rptr. 287].)

## III

### *The Concept of Punitive Damages in General*

There is substantial controversy in all American jurisdictions concerning the imposition of punitive damages. ▓ As Prosser explains, "[s]omething more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton." (Prosser on Torts (4th ed. 1971) § 2, pp. 9-10; see also, Stein, Damages and Recovery, Personal Injury and Death Actions (1st ed. 1972), ch. 12, p. 347 et seq.)

Punitive damages have been condemned as undue compensation of the plaintiff beyond his just deserts and defended as a salutary method of discouraging evil motives. The major modern rationale supporting their imposition is that of placing value on their "deterrent" quality. It has been urged that the "windfall" to an individual plaintiff can be avoided by the adoption of some system of diversion of punitive-damage awards from the plaintiff into a public fund, thereby removing the personal gain involved while retaining a traditional method of punishing a wrongdoer who will, because of such punishment, modify his future conduct accordingly.

The present debate invariably involves the question of to what extent, if any, punitive-damage awards should be imposed on corporate enterprises, whose activities may have a deleterious effect—not on just one individual—but on many. It has been argued—unsuccessfully so far—that punitive damages should be abandoned against such corporate activity because, in fact, they constitute no deterrent to corporate misconduct, but, rather, penalize the shareholders of corporations who have not participated in any wrongdoing and have no method of curtailing misconduct on the part of corporate agents. (See, *Punitive Damages Under FELA* (1971) 71 Colum.L.Rev. 1113, 1115.)

It seems abundantly clear, however, that punitive damages "are an established part of our legal system, and there is no indication of any present desire or tendency to abandon them." (Prosser, *supra*, § 2, p. 11.)

## IV

### *Punitive Damages as a Part of Federal Common Law*

We note that punitive damages have long been regarded as an integral part of federal common law. Thus, in the early case of *Lake Shore &c. Railway Co.* v. *Prentice* (1893) 147 U.S. 101 [37 L.Ed. 97, 13 S.Ct. 261], the United States Supreme Court was reviewing such an award imposed upon a corporate railway because one of its conductors had inexplicably subjected the plaintiff passenger to verbal abuse and harassment during a journey on one of the corporation's trains. The *Prentice* court declared that "[i]n this court, the doctrine is well settled, that in actions of tort the jury, in addition to the sum awarded by way of compensation for the plaintiff's injury, may award exemplary, punitive or vindictive damages, . . ." (*Id.* at p. 107 [37 L.Ed. at p. 101].) However, the *Prentice* court also held that while a corporation, like an individual, may be held liable for such damages, it could only be held to the extent that it authorized or ratified the evil conduct of its agent. In that case, no such authorization or ratification existed, and, thus, no punitive damages could be imposed; but the court's acceptance of the principle of a punitive-damage award remains intact.

There is considerable distance between "smart money," given for temporary discomfort and inconvenience, no matter how galling, to an individual plaintiff, and a punitive-damage award imposed to ensure a change in corporate policy. Insofar as we have been able to discover, the United States Supreme Court has not wavered on the concept of the punitive-damage award as a viable principle of federal common law.

## V

### *The Viability of Punitive Damages in Federal Maritime Actions*

An overall view of federal maritime law warrants the conclusion that, while numerous courts have expounded on the availability of punitive damages in a proper case, few have approved their imposition in the actual cases before the courts. (See, for example, the analysis of this situation presented in *Punitive Damages in Admiralty* (1967) 18 Hastings L.J. 995.) We have found no federal case flatly precluding a punitive-damage award in admiralty *as a matter of law;* much of the

admiralty case law, as in *Prentice, supra*, 147 U.S. 101, rests denial of a particular punitive-damage award on the absence of some factual element in the case under consideration.

Punitive damages were discussed in admiralty as early as 1818. In *The Amiable Nancy* (1818) 16 U.S. (3 Wheat.) 546 [4 L.Ed. 456], where a marine trespass had been committed, the court alluded to the possibility—indeed the desirability—of punishing the wrongdoers with a monetary award to the plaintiff; unfortunately, however, the particular wrongdoers at which the court was incensed were not before the court. Damages of a punitive nature were awarded in 1859, in *Gallagher* v. *The Yankee* (C.C.N.D. Cal.) 9 Fed.Cas. 1091 (No. 5196), affirmed 30 Fed.Cas. 781 (No. 18124); in that matter, the plaintiff had been taken involuntarily to the Sandwich Islands, and the court detected a positive element of conscious wrongdoing.

Ever since *Gallagher*, however, the decisional law reflects an overwhelming reluctance on the part of courts sitting in admiralty to award punitive damages although discussion of such an award has never been predicated on the ground that it cannot be done, but rather is contraindicated in the case before it. An example of the typical discussion of the issue may be found in *In re Marine Sulphur Queen* (2d Cir. 1972) 460 F.2d 89, 105, wherein it was said: "A condition precedent to awarding [punitive damages] is a showing by the plaintiffs that the defendant was guilty of gross negligence, or actual malice or criminal indifference which is the equivalent of reckless and wanton misconduct. There is no evidence in this case to support a finding of any of these elements. [Citation.] Even if there were some evidence of this sort, the award of punitive damages is discretionary with the trial court."

In *Gunnip* v. *Warner Co.* (E.D.Pa. 1968) 43 F.R.D. 365, 368, the issue surfaced in a case concerned with federal procedure. Plaintiff attempted to amend his complaint, brought pursuant to the Jones Act, to include punitive damages; the court held that he could do so.

There are some fairly recent cases which indicate that, at least in some well-defined areas, federal courts, sitting in admiralty, are overcoming their reluctance to impose punitive damages on a defendant in an appropriate case; these decisions will be discussed, *infra*.

## A. *Nature of Causes of Action Available to an Injured Seaman*

In order to clarify the arguments advanced by the parties herein, we very briefly review the nature of the causes of action available to an injured seaman, or, in the case of his death, to his personal representative; our review is general rather than exhaustive.[2]

■ *First.* The most basic remedy afforded an injured seaman is that of damages for items given the name—maintenance and cure; the objective is primarily the same as that of land-based worker's compensation laws. The plaintiff seaman is almost always entitled to food, lodging and medical care to be provided by his emloyer when the former is injured or becomes ill during the course of his employment; the entitlement lasts until some type of stability has attached to his condition. However, the maintenance and cure remedy differs markedly from land-based worker's compensation in that it is not the seaman's *exclusive* remedy when he is injured during the course of his employment.

■ *Second.* The seaman may also sue his employer for damages for personal injury.

After 1920, when the Jones Act was enacted into law[3] it was extensively utilized by seamen to pursue negligence actions against their employers, as the act provided for trial by jury and also afforded a remedy not available under general maritime law—for wrongful death. While the usual basic elements of negligence, duty, breach and proximate causation, are involved in these actions, it is not inaccurate to characterize them as subject to extremely liberal interpretations by the courts, interpretations that have favored the seaman-litigant.

The references in the Jones Act to "all statutes of the United States" applicable to "railway employees" are to the Federal Employers' Liabil-

---

[2]For such discussion and much helpful case analysis, see Gilmore & Black, The Law of Admiralty (2d ed. 1975) chapter VI.

[3]The Jones Act provides: "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of rail-

ity Acts (45 U.S.C. §§ 51-60), commonly known as FELA, and which govern the recovery available for personal injury and death to railroad workers. ■ It has long been held that Congress intended seamen and their land-based counterparts—railroad workers—to be treated in as uniform a fashion as possible. Judicial interpretations of FELA are regarded as persuasive authority in Jones Act litigation. (*Kernan* v. *American Dredging Co.* (1958) 355 U.S. 426 [2 L.Ed.2d 382, 78 S.Ct. 394]; *Cox* v. *Dravo Corp.* (3d Cir. 1975) 517 F.2d 620, 622.)

■ *Third.* The third avenue to recovery for an injured seaman results from acceptance of the principle that it has long been a shipowner's duty to provide his seamen with safe surroundings during his employment—a seaworthy vessel. This duty is not based on statute but has developed over centuries through decisional admiralty law. In recent times it has been expanded to the point where it is now considered a form of absolute liability. Writers such as Gilmore and Black (see fn. 2) identify the case of *Mahnich* v. *Southern S. S. Co.* (1944) 321 U.S. 96 [88 L.Ed. 561, 64 S.Ct. 455], as the beginning of what may be identified as an explosion of the *unseaworthy* cause of action. In *Mahnich*, the United States Supreme Court determined that "operational negligence" that involved a vessel could be classified as "unseaworthiness." This cause of action now outranks Jones Act actions as the most used remedy for the injured seaman.

Some early case law held that an injured seaman-plaintiff must elect between a cause of action pursuant to the Jones Act and a general maritime action based on the unseaworthiness doctrine. But this early case law no longer prevails. ■ It is common and acceptable practice for a plaintiff to plead both the Jones Act and the unseaworthiness doctrine and place both causes of action before the jury, although there is but one recovery. Since *Mahnich*, the distinctions between the two remedies have been largely obliterated, and, "[a]fter ten or fifteen years of confusion the admiralty lawyers and the admiralty judges came to understand that the Jones Act count and the unseaworthiness count are Siamese twins." (Gilmore & Black, *supra*, p. 383.)

These, then, are the ordinarily utilized causes of action available to an injured seaman, and plaintiff, in the case at bench, pleads them all.

---

way employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located."

### B. Does Federal Maritime Law Preclude the Imposition of Punitive Damages as a Matter of Law?

Defendant contends here that federal maritime law precludes the imposition of punitive damages as a matter of law. For this assertion, defendant relies on the reality that few cases in admiralty have afforded such relief. However, as we have pointed out previously herein, we have been cited to no authority, and we have found none, which declares this to be the current state of the law; there is no United States Supreme Court decision which can be said to constitute a holding to this effect.

What has actually happened when punitive damages have been sought in an admiralty case is illustrated by the history of the case of *Petition of Den Norske Amerikalinje A/S* (N.D. Ohio 1967) 276 F.Supp. 163. There the litigation arose from a collision of vessels. The district court judge, in a lengthy opinion, declared that "[t]he fact that punitive damages have never been visited upon a tortfeasor in an admiralty proceeding is no reason for precluding such a recovery.... Exemplary damages are the product of the common law and are not a creature of legislation. Thus, while certain statutes may specifically authorize the recovery of punitive damages, such specific reference is neither common nor necessary." (*Den Norske, supra*, 276 F.Supp. 163, 174-176.)

The *Den Norske* court relied upon *Vaughan* v. *Atkinson* (1962) 369 U.S. 527 [8 L.Ed.2d 88, 82 S.Ct. 997], in which a majority of the United States Supreme Court affirmed an award of attorney's fees to the seaman-litigant wrongfully denied maintenance and cure by his employer; it was said that the award was actually compensatory, and was to be given only in situations where oppressive or unjustifiable conduct had occurred. Justice Stewart, in a separate opinion, indicated that the award was actually one of punitive damages and, in the appropriate case, there was nothing wrong with making such an award.[4] The trial court awarded $70,000 in punitive damages in *Den Norske*.

In *United States Steel Corp.* v. *Fuhrman* (6th Cir. 1969) 407 F.2d 1143—the appeal from the *Den Norske* decision—the Sixth Circuit reversed the award of punitive damages but placed the reversal on the

---

[4]It was held in *Kraljic* v. *Berman Enterprises, Inc.* (2d Cir. 1978) 575 F.2d 412, that the *Vaughan* ruling by the majority did *not* indicate approval of the imposition of punitive damages on occasion but was strictly limited to its facts; thus, a seaman wrongfully deprived of maintenance and cure was limited to recovery of attorney fees only.

ground that the evidence adduced below had *not* established corporate liability for the misconduct which was the subject of the seaman's complaint. The *Fuhrman* court observed: "We think the better rule is that punitive damages are not recoverable against the owner of a vessel for the act of the master *unless* it can be shown that the owner *authorized* or *ratified* the acts of the master either before or after the accident. *Punitive damages also may be recoverable* if the acts complained of were those of an unfit master and the owner was reckless in employing him." (*Fuhrman, supra,* 407 F.2d 1143, 1148.) (Italics added.)

Our analysis of *Fuhrman* leads inexorably to the conclusion that, once again, a maritime court was acknowledging the principle of law of the acceptability and viability of a punitive-damage award in maritime law, while finding against the award on the facts before it. In addition, the *Fuhrman* court was wrestling with what has been identified as one of the basic dilemmas inherent in the punitive damage area, i.e., the extent of corporate liability for the oppressive conduct of an agent. (See Prosser, *supra,* § 2, p. 12.)

In 1973, employing *Vaughan* v. *Atkinson, supra,* 369 U.S. 527, as the authoritative precedent, the First Circuit upheld a punitive-damage award imposed upon an employer who had failed, with no apparent justification, to provide seaman Robinson with maintenance and cure. (*Robinson* v. *Pocahontas, Inc.* (1st Cir. 1973) 477 F.2d 1048.)[5] Declaring that the evidence had shown sufficiently reprehensible conduct on the part of the defendant, the punitive-damage award was upheld; it is significant that the award was *not* limited to recovery of attorney fees.

Two years later, in *Renner* v. *Rockwell International Corporation* (C.D.Cal. 1975) 403 F.Supp. 849, 852, the district court judge declared (in a pleading case) that punitive damages would be potentially recoverable by the plaintiffs in the trial of a wrongful death action. The trial judge relied on two United States Supreme Court cases which demonstrate rather emphatically the continuing emphasis placed by that court in the area of maritime tort law on a liberal and protective application of rules of law that benefit those injured in a maritime setting. The cases referred to were *Moragne* v. *States Marine Lines* (1970) 398 U.S. 375 [26 L.Ed.2d 339, 90 S.Ct. 1772] and *Sea-Land-Services,Inc.* v. *Gaudet* (1974) 414 U.S. 573 [39 L.Ed.2d 9, 94 S.Ct. 806].

---

[5]This case was the subject of a note in 15 San Diego L. Rev. at pages 309-330. On page 309 the author declared that "[c]ourts sitting in admiralty have so seldomly awarded punitive damages for maritime torts that the event in itself is noteworthy."

In *Moragne* the United States Supreme Court overruled a long-established precedent in general maritime law and created a new cause of action for wrongful death. In *Gaudet,* a case involving the death of a seaman in state territorial waters, the nation's high court reaffirmed the concept of an independent body of federal maritime law that is dependent on no state or federal statute but is subject to continuing delineation by the federal courts sitting in admiralty.

The *Robinson* (477 F.2d 1048) and *Renner* (403 F.Supp. 849) cases appear to us to be persuasive indications that substantial inroads are being made upon the prior reluctance to impose punitive damages in admiralty cases. We consider the extension made in *Robinson* as totally consistent with the policy of many land-based worker's compensation statutes which penalize the land-based employer who engages in similar reprehensible conduct. It, of course, remains the province of the United States Supreme Court, as well as the individual circuits, to determine the parameters of recovery for a *Moragne*-type wrongful death action.

### C. *FELA Precedents Do Not Constitute a Bar to Punitive Damages in Jones Act Cases*

Defendant advances the argument: (1) that Jones Act cases are governed by FELA precedents; and (2) that under those FELA precedents, punitive damages are precluded as a matter of law; so that (3) none can be awarded in a Jones Act case even when the Jones Act cause of action is accompanied by a cause of action for unseaworthiness; because (4) the Jones Act and unseaworthiness causes of action are virtually the same. We reject the argument as untenable and unsupportable.

As we have already indicated, there is ample authority for the first premise advanced by defendant, i.e., that Jones Act cases are governed by FELA precedents. But this premise is not absolute as defendant would have us hold. It is well to be mindful of the admonition of the United States Supreme Court, set forth in *Cox* v. *Roth* (1955) 348 U.S. 207 [99 L.Ed. 260, 75 S.Ct. 247], that the kinship of railway workers and seamen, as perceived by Congress, should not lead to overly literal or rigid transplanting of principles from land to sea, or vice versa. Clearly, FELA decisions are persuasive with respect to the Jones Act, but may not be considered to be the ultimate authority.

We recognize that one federal circuit has determined that, in a FELA case, there can be no recovery of punitive damages. In *Kozar* v. *Chesapeake and Ohio Railway Company* (W.D.Mich. 1970) 320

F.Supp. 335, the district court awarded punitive damages against defendant railway.[6] On appeal, the Sixth Circuit, in 1971, reversed the award on the ground that FELA afforded damages as compensation only rather than for punishment. (*Kozar v. Chesapeake and Ohio Railway Company* (6th Cir. 1971) 449 F.2d 1238.)[7]

Thus, if the Jones Act cause of action in the instant case were controlled by the FELA precedent set forth in *Kozar*, it would appear that punitive damages would be barred on *that* cause of action in the case before us. But we do not consider that *Kozar* is either controlling or persuasive on the question of whether a Jones Act cause of action automatically precludes a recovery of punitive damages. But beyond that, neither *Kozar* nor any of its progeny can be permitted to place limitations on a seaman's cause of action founded on general maritime law that recognizes the unseaworthiness doctrine.

The demonstrated tendency of the United States Supreme Court has been to regard the Jones Act as *primarily* an addition to an even larger body of federal maritime law *whenever* FELA precedent would in some manner *limit* the liability imposed on a defendant shipowner. (See, e.g., *The Arizona* v. *Anelich* (1936) 298 U.S. 110 [80 L.Ed. 1075, 56 S.Ct. 707] and *Beadle* v. *Spencer* (1936) 298 U.S. 124 [80 L.Ed. 1082, 56 S.Ct. 712].) On such occasions, the United States Supreme Court has called attention to the existence of an independent body of federal law, of which the Jones Act is only a part, and has *not* allowed the Jones Act to be utilized as a conduit through which limitations on liability could pass from land-based law such as FELA doctrines.

While there is considerable overlapping between Jones Act negligence and the doctrine of unseaworthiness, there is simply neither authoritative precedent nor reasons of policy for imposing whatever limitations exist in Jones Act litigation on general federal admiralty law, from which the doctrine of unseaworthiness is derived. On the contrary, all present indications—as expressed in *Moragne* and *Gaudet*—lead to the conclusion that the United States Supreme Court continues to regard tort actions based on general admiralty law as the particular province of decisional law development and an area where principles are applied with a liberal rather than a restraining hand.

---

[6]A decision roundly criticized in a note in 71 Columbia Law Review entitled *Punitive Damages Under FELA* at page 1113.

[7]The *Kozar* ruling was followed by a Montana decision (*State* ex rel. *Burlington Northern, Inc.* v. *Dist. Ct.* (1976) 169 Mont. 480 [548 P.2d 1390].)

In the context of the present action, the corporate conduct complained of purportedly consisted of making an informed and calculated decision to practice economy in providing defendant's seamen with the safe environment required by the federal law of admiralty and the doctrine of unseaworthiness. The defendant's decision assertedly involved acceptance of the risk that certain seamen might be exposed to substantial injury from high-level noises during the course of their employment. Since we are at the pleading stage, we have before us only the dim outlines of the situation upon which this litigation is based. It is generally recognized, however, that "[e]mployers appear to be in the best position to know or discover workplace health hazards that produce disease [or disability] and to control these hazards."(*Compensating Victims of Occupational Disease* (1980) 93 Harv.L.Rev. 916, 933.)

It is not necessary for us to determine whether a corporate decision, consciously made for economic reasons, may, on occasion, constitute an evil for which the law allows no redress. Here the plaintiff has alleged a good and valid cause of action for punitive damages, unless federal law precludes the statement of such a cause of action. We hold unequivocally that plaintiff is entitled to present the issue of punitive damages to a jury and that there is sufficient authority in federal admiralty law in support of our holding.

Let a peremptory writ of mandate issue, directing the trial court to vacate its order of November 5, 1979, insofar as that order struck plaintiff's allegations concerning punitive damages, and to reinstate those allegations and the prayer as contained in plaintiff's first amended complaint.

Marshall, J.,* concurred.

**HANSON (Thaxton), J.**—I respectfully dissent for the reasons stated in the majority opinion.

In my opinion the ball game is over and the petition should be denied once the majority opinion correctly concluded, as it did, (1) that while litigants may elect to pursue recovery pursuant to the Jones Act (46 U.S.C. § 688) and under the general maritime law doctrine of unseaworthiness in state courts, as distinguished from federal courts (probably for some perceived *procedural* reasons), "The prevailing rule is

---

*Assigned by the Chairperson of the Judicial Council.

that, regardless of the forum, federal [maritime] *substantive* law applies" (original italics); (2) that the remedies available under the Jones Act and the unseaworthiness doctrine can produce only one recovery and are now considered "Siamese twins"; and (3) that no federal statute has expressly authorized nor has any federal decisional law awarded punitive damages under circumstances presented in the instant case.

In clear language the Jones Act adopts the law of the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 et seq.)[1] which governs actions against railroads (which criss-cross the United States) by their employees, thus making FELA part of the Jones Act for the purposes announced. (See *Engel* v. *Davenport* (1926) 271 U.S. 33, 38 [70 L.Ed. 813, 817, 46 S.Ct. 410]; *Bell* v. *Tug Shrike* (E.D.Va. 1963) 215 F.Supp. 377, affd. 332 F.2d 330, cert. den. 379 U.S. 844 [13 L.Ed.2d 49, 85 S.Ct. 84]; *Cox* v. *Dravo Corporation* (3d Cir. 1975) 517 F.2d 620, cert. den. 423 U.S. 1020 [46 L.Ed.2d 392, 96 S.Ct. 457]; *Dixon* v. *Grace Lines, Inc.* (1972) 27 Cal.App.3d 278 [103 Cal.Rptr. 595].)

It is also clear that in FELA actions *only* compensatory damages are recoverable. Punitive damages are *not* allowed. (See *Kozar* v. *Chesapeake and Ohio Railway Company* (6th Cir. 1971) 449 F.2d 1238; see also *State* ex rel. *Burlington Northern, Inc.* v. *District Court* (1976) 169 Mont. 480 [548 P.2d 1390, 1392-1393]; *Orona* v. *Isbrandtsen Co.* (S.D.N.Y. 1962) 204 F.Supp. 777, 779; *Cleveland Tankers* v. *Tierney* (6th Cir. 1948) 169 F.2d 622, 624; *Vanbeeck* v. *Sabine Towing Co.* (1937) 300 U.S. 342 [81 L.Ed. 685, 57 S.Ct. 452]; *Mpiliris* v. *Hellenic Lines Ltd.* (S.D.Tex. 1970) 323 F.Supp. 865, 874, affd. (1971) 449 F.2d 1163.)

Accordingly, since federal maritime substantive law adopting FELA, as noted above, applies and *not* California substantive law, and since the "Siamese twins" remedies under the Jones Act and unseaworthiness doctrine can produce only one recovery, it is axiomatic that one "twin" (unseaworthiness doctrine) cannot recover exemplary damages while the other "twin" (the Jones Act) is limited to compensatory damages only. To allow such a result in a "Siamese twin" situation would be illogical.

---

[1]The Jones Act in pertinent part provides: "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of a trial by jury, and *in such action all statutes of the United States modifying or extending the common law right or remedy in cases of personal injury to railroad employees shall apply;...*" (Italics added.)

The majority opinion concedes that recent case law reflects an overwhelming reluctance on the part of the courts sitting in admiralty to award punitive damages and then flatly concludes that since no federal law precludes the plaintiff from presenting the issue of punitive damages to a jury, it is proper for a state court to authorize such damages by decisional law.

While reasonable minds may differ construing statutory and decisional law, in my view there is no federal authority in admiralty whatsoever supporting the majority opinion's determination. The cases cited are factually distinguishable and the language referred to in those opinions is mere dicta and not binding authority. Nor does the fact that federal law does not expressly prohibit punitive damages in any way license a state court to impress upon the federal system its proclivity to expand the circle of civil liability to infinity. To the contrary, the fact that federal law only allows compensatory damages and does not expressly include exemplary damages indicates that it was not intended that such damages be included in the overall carefully thought out statutory scheme concerning maritime personal injury claims.

In my opinion it is not only highly improper and presumptuous but also grossly unwise for a California state court of review by judicial fiat to invade the federal jurisidiction and attempt to graft onto federal maritime law a punitive damage claim where none presently exists, thereby destroying the important concept of the need to preserve *uniformity* in maritime tort law regardless of the place of injury.[2] The practicality and desirability of preserving a *uniform* federal law in this field is apparent in view of the many states which border the Atlantic and Pacific Oceans, the great Saint Lawrence Seaway into the Great Lakes, and the Gulf of Mexico as well as the numerous interior states by and through which a labyrinth of inland navigable waterways pass.

I would therefore hold as a matter of law that the petitioner may not seek an award of punitive damages in addition to compensatory damages. I would leave to the United States Congress and to the federal

---

[2]The major premise of the *Jensen Doctrine* (see *Southern Pacific Co. v. Jensen* (1917) 244 U.S. 205 [61 L.Ed. 1086, 37 S.Ct. 524]), which remains good and sound law today, is that maritime law should be *uniform* within the United States. The need for national maritime *unity* was confirmed by the United States Supreme Court in *Knickerbocker Ice Co. v. Stewart* (1920) 253 U.S. 149 [64 L.Ed. 834, 40 S.Ct. 438, 11 A.L.R. 1145].

courts interpreting federal statutory enactments the determination as to whether or not exemplary damages should be allowable in maritime tort claims.

I would affirm the trial court's order striking plaintiff's allegations concerning punitive damages and deny the petition for writ of mandate.[3]

A petition for a rehearing was denied June 24, 1980, rule 27(e), California Rules of Court. The petition of real party in interest for a hearing by the Supreme Court was denied July 17, 1980. Clark, J., was of the opinion that the petition should be granted.

---

[3]The result of the majority opinion in my view is disturbing in two other practical aspects which should not be ignored.

First, such a pronouncement by a single state within the union will tend to unnecessarily snarl and foul the lines in the field of maritime tort law which in recent years have slowly become unsnarled and unfouled. (See *The Tangled Seine: A Survey of Maritime Personal Injury Remedies* (1947) 57 Yale L.J. 243-274.)

Secondly, there are a great number of companies or individuals who own fleets of vessels with large crews which sail the seven seas and which are either located in or have business contacts in California, thus subjecting them to the jurisdiction of our state courts. It is reasonably forseeable that litigants and lawyers from all over the United States (indeed the world) may rush into California courts with their maritime cases seeking "windfall" exemplary damages, thus either sinking our already overcrowded courts into the briny deep or requiring the long suffering California taxpayers to add more courts to act as bilge pumps to process such out of state claims in order to stay afloat. This possibility punctuates the desirability of a *uniform* maritime law and any changes in the present law should be left to federal authorities in order to insure the case load is spread throughout the various states.